IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DANIELLE JOYCE LATHAN, ) | CASE NO. 3:14CV2009 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | MAGISTRATE JUDGE |
| ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY ADMINISTRATION, ) | |
| ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. ) | |

Plaintiff Danielle Joyce Lathan ("Lathan") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 12.

For the reasons stated below, the Commissioner's decision is **AFFIRMED**.

**I. Procedural History**

Lathan protectively filed an application for DIB on May 27, 2010, alleging a disability onset date of May 1, 2009.  Tr. 19, 145, 164.  She alleged disability based on the following: recurrent migraines, recurring side effects from past chemotherapy, and post low-grade lymphoma (stage unknown) in remission.  Tr. 168.  After denials by the state agency initially (Tr. 64, 74) and on reconsideration (Tr. 65, 82), Lathan requested an administrative hearing.  Tr. 89.  A hearing was held before Administrative Law Judge ("ALJ") Melissa Warner on March 7, 2013.  Tr. 33-54.  In her April 15, 2014, decision (Tr. 19-26), the ALJ decided the case at Step

1

Two of the sequential analysis, determining that Lathan was not disabled because she did not have an impairment or combination of impairments that has, or is expected to, significantly limit her ability to perform basic work-related activities for twelve consecutive months. Tr. 26. Lathan requested review of the ALJ's decision by the Appeals Council (Tr. 15) and, on July 10, 2014, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Lathan was born in 1954 and was 56 years old on the date her application was filed. Tr. 164. She completed twelfth grade. Tr. 169. She previously worked for 23 years as a polisher and a packager at a glass factory. Tr. 169. She last worked in 2009. Tr. 169.

### B. Medical Evidence

Lathan was diagnosed with non-Hodgkin's lymphoma in 2006. Tr. 256. She kept working during her chemotherapy treatment despite having some fatigue that began halfway through the day. Tr. 258. She responded well to treatment and her cancer went into remission. Tr. 266 (May 2006 treatment note of her oncologist, Dr. Howard L. Ritter, Jr., M.D., that Lathan "did quite well" with chemotherapy and was feeling "pretty good"); 420 (January 2008 Dr. Ritter treatment note stating that, two years after her diagnosis, Lathan "continues doing well, fully active, enjoying good energy and activity levels, and working full time," after completing chemotherapy). In April 2008, she reported to Dr. Ritter that she was feeling fine in general but "a bit tired chronically." Tr. 421. Based on her blood test and a CT scan, Dr. Ritter suspected that there was a recurrence of her cancer in her bone marrow. Tr. 421.

2

A bone marrow biopsy performed in June 2008 confirmed Dr. Ritter's suspicions and Lathan began an eight week course of Rituxan therapy.  Tr. 423-424.  After three doses of Rituxan, Lathan reported intermittent lower abdominal pain with nausea and vomiting.  Tr. 425.  She then developed diarrhea and headaches; the diarrhea resolved with Imodium and she reported doing fairly well.  Tr. 425-426.   The day of her last Rituxan treatment, August 4, 2008, Lathan reported that throughout her treatment she has been nauseous, "quite fatigable and unable to work" but, apart from that, doing "quite well."  Tr. 427.

On September 15, 2008, Lathan complained to Dr. Ritter of sores in her mouth, swollen lips, redness, and rashy spots on her lower legs.  Tr. 429.  Dr. Ritter prescribed a mouthwash; Lathan's mouth had improved by September 18.  Tr. 429.  She was treated for cellulitis and a treatment note from September 22 noted improvement and only a small amount of swelling remaining.  Tr. 432.   On September 30, her left leg was "getting worse again" and Dr. Ritter ordered a Doppler ultrasound.  Tr. 433.  Lathan had begun wearing support hose.  Tr. 433.  The ultrasound showed bilateral inguinal lymph node enlargement. Tr. 434.  On October 22, Dr. Ritter noted that Lathan's problem with her legs seemed to be resolving itself and did not appear to be due to lymphoma. Tr. 435.  On January 20, 2009, Dr. Ritter noted that Lathan has done quite well since the last visit and that the skin on her legs had cleared up entirely.  Tr. 436.  She was "entirely asymptomatic" with only complaints of aching legs when walking long distances.  Tr. 436.

On April 21, 2009, Dr. Ritter noted that Lathan "continues doing very well, working full time, leading a normal family life, and enjoying freedom from any relapse of her previous and unexplained swelling in her legs."  Tr. 438.  On November 9, 2009, Dr. Ritter remarked that Lathan was "feeling fine, entirely well, with no symptoms at all."  Tr. 440.  On January 25, 2010,

Lathan complained of easily aggravated pain symptoms in both legs, as well as swelling in the ankles. Tr. 441. Upon examination, Dr. Ritter did not observe swelling or skin abnormalities; he believed it was "some kind of post cellulitic neuropathic syndrome." Tr. 441.

On February 2, 2011, Lathan saw Dr. Ritter for a follow-up visit. Tr. 529. She was "entirely asymptomatic, active, enjoying good energy and stamina" and "appeared entirely well and in excellent spirits." Tr. 529. In June 2011, Dr. Ritter referenced Lathan's complaints of frequent diarrhea and referred her to a gastroenterologist, Dr. Harsant S. Padda. Tr. 554; 590. Dr. Padda's treatment note reported that Lathan has diverticulitis-associated colitis; he advised her to eat a high-fiber diet and stated that her long-term prognosis is good. Tr. 590. In a visit to Dr. Ritter on August 22, 2011, Lathan reported "good improvement" with her diarrhea after getting advice from Dr. Padda. Tr. 563.

During the time she was seeing Dr. Ritter, Lathan also had regular appointments with her family doctor, Bonaventure Okoro, M.D. On September 29, 2008, Lathan complained of, and Dr. Okoro noted, left leg swelling. Tr. 466. Otherwise, treatment notes overwhelmingly indicate normal findings. Tr. 458-492. He prescribed the nasal spray Stadol and Fioricet for Lathan's headaches. Tr. 488, 584, 595. On April 30, 2012, Lathan saw Dr. Okoro complaining of chest pain and a headache described as "constant, pressure, sharp, squeezing, stabbing, tension, throbbing and worsening." Tr. 600. On June 29, 2012, Lathan presented with feet and ankle swelling and hypertension with symptoms including headache, visual disturbance, chest pain, weakness and edema. Tr. 604. Upon examination, Dr. Okoro noted no edema in her feet or extremities. Tr. 605. Her blood pressure was 160/90. Tr. 605. On September 24, 2012, Lathan complained of diarrhea that started three days prior. Tr. 612. Her blood pressure was 180/100. Tr. 613. On November 2, 2012, she complained of headache, chronic gastritis and abdominal

discomfort.  Tr. 626.  On December 31, 2012, she complained of chest pain, leg pain, and fatigue.  Tr. 620-621.  She reported that she fell in her kitchen while doing dishes and that her husband took her blood pressure and it was 70/50.  Tr. 621.  She did not want to go to the emergency room.  Tr. 621.  Dr. Okoro advised her to go to the emergency room for assessment of her chest pain.  Tr. 621.  Lathan did as advised.  Tr. 638-655.

On January 28, 2013, after the hearing, Lathan underwent an echocardiogram that showed mild concentric left ventricular hypertrophy and mild to moderate tricuspid regurgitation. Tr. 631-632.

   C. **Medical Opinion Evidence**

      **1. Treating Source Opinions**

         **a. Dr. Okoro**

On July 8, 2011, Dr. Okoro completed a "Physical Capacities Evaluation."  Tr. 556-557. Dr. Okoro opined that Lathan was unable to sit, stand, or walk at all during an 8-hour workday and unable to lift 10 pounds.  Tr. 556.   She could not use her hands.  Tr. 556.  He indicated that she would require complete freedom to rest frequently without limitation, that she would have to lie down for substantial periods during the day, and that she would likely miss 5 or more days from work per month due to exacerbation of her condition if she were to return to work.  Tr. 556-557.

On December 17, 2012, Dr. Okoro completed a "Post Cancer Treatment Medical Source Statement."  Tr. 614-617.  He listed the following symptoms Lathan experienced as a result of her cancer or treatment: fatigue, muscle pain, depression, muscle weakness, lower leg swelling, chronic headaches, anxiety, disturbed sleep, and impaired memory.  Tr. 614.  Other diagnoses included tiredness and body weakness.  Tr. 614.  Dr. Okoro opined that she could sit and

5

stand/walk less than 2 hours in an 8-hour workday and that she would need to take more than ten unscheduled breaks for more than 2 hours in a work day due to pain, fatigue, medication side effects, weakness, leg pain and swelling in her knee and ankle joints, and diarrhea. Tr. 615-616. Her symptoms would cause her to be off task 25% or more of a workday and she is incapable of even low stress work. Tr. 616-617.

### b. Dr. Ritter

On June 6, 2011, Dr. Ritter wrote a letter stating,

> Danielle comes back to talk to me because she believes that the way I filled out a disability form indicates that she is fully capable of working. I explained to her that I completed the form only in reference to lymphoma, which is not incapacitating to her. She perceives that she was treated unfairly by her previous employer in that she was visiting the bathroom too often while at work, which she had to do because of intractable diarrhea, which she believes stems from the chemotherapy she originally received for lymphoma .... I am going to refer her to a gastroenterologist for evaluation. I explained to Danielle that this is not something that we normally see as a result of chemotherapy, and that she likely has a remediable cause for her symptoms. I also told her that her attorney could give me a call if he would like a letter of clarification that I was referring only to her history of lymphoma when I indicated that she was not disqualified or disabled for work.

Tr. 554.

### 2. Consultative Examiner

On December 2, 2010, Lathan saw Sushil M. Sethi, M.D., for a consultative examination. Tr. 495-497. Lathan reported a history of migraines for "many, many years" and that she takes medications that keep them "under control." Tr. 495. She believed that the last chemotherapy treatment caused "marked weakness and tiredness." Tr. 495. Upon examination, Dr. Sethi's findings were all normal except for mild tenderness in Lathan's tailbone area and reduced range of motion in her lumbar spine and both knees. Tr. 495-501. He diagnosed Lathan with a history of low-grade tumor, cancer of the lymph glands, past history of lumpectomy of the left breast, status-post chemotherapy; hypertension; stomach ulcer; and migraine headaches. Tr. 497. Dr.

6

Sethi wrote, "Based on my objective findings, the claimant's ability to do work-related physical activities such as sitting, standing, walking, lifting, carrying and handling objects and traveling appears to be quite limited due to recurrent treatment with chemotherapy." Tr. 497.

### 3.  State Agency Reviewers

On February 8, 2011, Elliott Goytia, M.D., a state agency physician, reviewed Lathan's file.  Tr. 503-508.   Dr. Goytia opined that Lathan could perform sedentary work based on her lymphoma and chronic disease.  Tr. 504-505.  On February 25, 2011, state agency physician Ronald Rossman, M.D., reviewed Lathan's filed and Dr. Goytia's opinion.  Tr. 509.  He questioned whether the records supported a sedentary residual functional capacity ("RFC") finding and recommended obtaining current hematology-oncology notes.  Tr. 509.   Specifically, Dr. Rossman noted that Dr. Sethi's opinion found limitations based on his objective findings yet Dr. Sethi's objective findings on examination were normal.  Tr. 509.  He also referenced Dr. Ritter's progress notes that Lathan was doing well and stated that these records did not support the sedentary RFC assessment by Dr. Goytia.

On April 12, 2011, state agency reviewer W. Bolz found that Lathan does not have a severe impairment. Tr. 548.   He referenced Dr. Ritter's treatment notes and stated that Lathan's diarrhea appeared to be treatable.  Tr. 548.  He opined that Dr. Sethi's opinion should be entitled to little weight.  Tr. 548.

On September 15, 2011, state agency physician Eli Perencevich, D.O., affirmed Bolz's opinion.  Tr. 564.  He referenced Dr. Ritter's treatment notes, Lathan's resolution of her diarrhea after seeing a gastroenterologist, and normal physical exams.  Tr. 564.

### D. Testimonial Evidence

#### 1.  Lathan's Testimony

Lathan was represented by counsel and testified at the administrative hearing. Tr. 35-51. She lives with her husband in a one-story home; they are both retired. Tr. 38, 39, 45. She completed twelfth grade. Tr. 39. She worked at Libby Glass after she graduated from high school until her retirement. Tr. 39-40. She worked repackaging the glass; the heaviest she regularly lifted was 60 pounds. Tr. 40. After her job packaging glass she worked polishing molds, which required her to lift at most 70 pounds. Tr. 40. She testified that she can no longer lift 50 pounds. Tr. 43. She explained that she was not lifting 50 pounds at work after her first chemo treatment because her employer put her on "blanks," which were lighter molds. Tr. 44.

Lathan stated that she is limited to walking ¾ of a block because of her legs, which start throbbing and aching from the knees down, and swelling in her ankles. Tr. 41. These symptoms started after her last chemotherapy treatment. Tr. 41. She was still working at the time. Tr. 41. She would take breaks every hour or so to sit down. Tr. 41. Sometimes she would go to the bathroom so people at work would not see her. Tr. 41. She also stated that she would "take off maybe 15, 20 minutes within a[n] hour." Tr. 41. Her employer allowed her to take breaks as long as she did her job but "they start[ed] having a problem with it." Tr. 41-42. She stated that her employer started having a problem with it because her chemo gave her diarrhea and her employer claimed that she was out of the department more than she was working. Tr. 42. When asked what changed, she stated that her employer changed how they handled things. Tr. 42.

She testified that she had diarrhea once a day, depending on what she ate or drank. Tr. 42. Sometimes she would have it seven times a day and then she was weak. Tr. 42. This caused her to rest when she came back from the bathroom at work. Tr. 42. Sometimes her boss was waiting for her. Tr. 42-43. She stated that her employer told her that something had to be done, and so she retired when she turned 55 or else they were "going to get rid of me." Tr. 43.

8

Lathan stated that she saw a gastroenterologist who put her on a limited diet and that "it worked sometimes" but sometimes it did not. Tr. 44. She had diarrhea three times the week of the hearing. Tr. 44. Since she stopped working, she can stand for about 15 minutes and sit for about 20 minutes. Tr. 44. She is unable to sit longer than that because her legs start aching from her knees down. Tr. 45. She explained that her leg problems were caused by her last chemo treatment from which she developed a cellulite infection. Tr. 45. She is unable to bend and touch her knees. Tr. 45. She also testified that her arms ache from the chemo treatment and that she cannot lift her arms above her shoulders. Tr. 45. Her hands also swell up and cramp. Tr. 45.

On a typical day, Lathan gets up and her husband helps her dress. Tr. 46. She sits around and then runs the sweeper for a bit, then sits down; it takes her about an hour to do one room. Tr. 46. She has a driver's license but sometimes has difficulty driving because of her legs and feet and her medications that cause her to be off balance. Tr. 38. She gets migraine headaches every day. Tr. 46. When she gets a headache, she takes her medicine, lies down, and the headache goes away, but it comes back before the end of the day. Tr. 46. She has had migraines since she was injured at work. Tr. 46. She continued working while having migraines; she would take her medication then go back to work. Tr. 46-47.

Lathan also testified that her ability to work is affected by anxiety, depression, and sore muscles. Tr. 47. Her anxiety stems from her frustration at not being able to do what she used to do and that it takes her longer to do things. Tr. 47. She also described difficulties breathing, which she has had since her cellulite infection. Tr. 47. She relayed that she had chest pain in December that caused her to pass out in her kitchen in December 2012. Tr. 48. She felt like she was having a heart attack. Tr. 48. She was told that she has vascular congestion and "the only

9

thing they got to look out for is for swelling in my legs and stuff." Tr. 48. She was prescribed two medications, including a blood thinner. Tr. 48. She was still experiencing chest pains at the time of the hearing and her next appointment was scheduled for a month after the hearing date. Tr. 49. She was told she may get a catheter to determine whether the blood flow to her heart is normal. Tr. 49.

### 2. Vocational Expert's Testimony

Vocational Expert Mr. McBee ("VE") testified at the hearing as to Lathan's prior work. Tr. 53. The ALJ asked the VE if he wished to clarify his vocational summary. Tr. 53. The VE answered that he did, and stated that the mold polisher job as performed by Lathan would be at the heavy exertional level. Tr. 53. He also stated that, as performed by Lathan, the job of hand packager would change to a material handler based on the amount of weight Lathan lifted continuously or at least frequently. Tr. 53. He described that the job of material handler is performed at the heavy exertional level. Tr. 53.

## III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

10

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her April 15, 2013, decision, the ALJ made the following findings:

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

11

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.  Tr. 21.

2. The claimant has not engaged in substantial gainful activity since May 1, 2009, the alleged onset date.  Tr. 21.

3. The claimant had the following medically determinable impairments: a history of lymphoma status post chemotherapy, recurrence and chemotherapy in remission—remote and no current duration; obesity; migraines; and hypertension.  Tr. 21.

4. The claimant does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant does not have a severe impairment or combination of impairments.  Tr. 21.

5. The claimant has not been under a disability, as defined in the Social Security Act, from May 1, 2009, through the date of this decision.  Tr. 26.

### V. Parties' Arguments

Lathan objects to the ALJ's determination at Step Two that she does not have a severe impairment and argues that the ALJ's decision is not supported by substantial evidence.  Doc. 14, p. 8.  She asserts that the ALJ failed to give controlling or great weight to the opinion of her treating physician, Dr. Okoro, misinterpreted the opinion of her treating oncologist, Dr. Ritter, and that the ALJ's treatment of those opinions was inconsistent with the ALJ's finding that Lathan was credible.  Doc. 14, pp. 9-14.  In response, the Commissioner submits that the ALJ reasonably found that Lathan's impairments did not cause significant work-related limitations and were, therefore, not severe.  Doc. 16, pp. 4-9.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

At Step Two, a claimant must show that she suffers from a severe medically determinable physical or mental impairment.  20 C.F.R. § 404.1520(a)(4)(ii).  It is Lathan's burden to show the severity of her impairments.  *Foster v. Sec'y of Health & Human Servs*., 899 F.2d 1221, *2 (6th Cir. 1990)* (unpublished) (citing *Murphy v. Sec'y of Health & Human Servs*., 801 F.2d 182, 185 (6th Cir. 1986)).  An impairment is not considered severe when it does not significantly limit the claimant's physical or mental ability to do basic work activities (without considering the claimant's age, education, or work experience).[2] *Long v. Apfel*, 1 Fed. App'x 326, 330-332 (6th Cir. 2001); 20 C.F.R § 404.1521(a).

A claimant's burden at Step Two is *de minimis*.  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  "An impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  The *Higgs* court observed that "this lenient interpretation of the severity requirement in part represents the courts' response to the Secretary's questionable practice in the early 1980s of using the step two regulation to deny meritorious claims without proper vocational analysis." *Id*.  But the court also

---

[2] Basic work activities are defined by the regulations as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b).  Examples, include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) the capacity to see, hear and speak; (3) the ability to understand, carry out, and remember simple instructions; (4) use of judgment; (5) ability to respond appropriately to supervision, co-workers, and usual work situations; and (6) the ability to deal with changes in a routine work setting.  *Id*.

recognized that "Congress has approved the threshold dismissal of claims obviously lacking medical merit . . . ." *Id*. That is, "the severity requirement may still be employed as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Id*. at 863 (affirming dismissal because the record contained no objective medical evidence to support the claimant's allegations of severe impairment).

Although Lathan generally asserts that the ALJ erred in her Step Two determination, Doc. 14, pp. 8-9, she specifically argues that the ALJ erred in her treatment of the opinions of her treating physicians, Drs. Okoro and Ritter, and that her treatment of these doctors' opinions was inconsistent with the ALJ's finding that Lathan was credible. Doc. 14, p. 9-14.

### A. The ALJ did not err when assigning weight to the medical opinions and substantial evidence supports her decision

Lathan argues that the ALJ erred because she failed to give her treating physician, Dr. Okoro, controlling or great weight. Doc. 14, p. 9. Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(a)-(d); *Bowen v. Comm'r of Soc Sec*., 478 F.3d 742, 747 (6th Cir. 2007).

14

With respect to Dr. Okoro's opinion, the ALJ explained,

> The claimant's primary care physician, Bonaventure Okoro, M.D., also filled out two medical source statements on the claimant's behalf in which he concluded that the claimant could only lift up to six pounds and could sit and stand no more than an hour each in an eight hour work day. Additionally, he stated that the claimant would have to take more than 10 unscheduled breaks during a work day and would have to rest more than two hours before having to return to work. The representative argued at the hearing th[at] Dr. Okoro's opinions should be given more weight since he sees the claimant more than Dr. Ritter does. Although this may be true, the undersigned cannot give great weight to a doctor's opinion that contrasts with the remainder of the record to include the claimant's continual statements that she is doing well and the fact that she continued to work despite any limitations she has alleged. Dr. Okoro's own records from June 2010 state that the claimant was doing well and none of the records support continuing reports of such severity that would justify a claimant having to lie down most of the day as his opinions would suggest. The undersigned therefore gives Dr. Okoro's opinions little weight in this matter.

Tr. 25.

The ALJ gave "good reasons" for assigning little weight to Dr. Okoro's opinion. *See Wilson*, 378 F.3d at 544. She commented on the established treatment relationship between Lathan and Dr. Okoro, but observed that Dr. Okoro's opinion is not supported by his own records and is inconsistent with the record as a whole, including documentation that Lathan was doing well and continued to work. *See* 20 C.F.R. § 416.927(a)-(d).

Lathan claims that Dr. Okoro's opinion is supported by Dr. Sethi's opinion. Doc. 14, p. 10. However, the ALJ considered Dr. Sethi's opinion and concluded that Dr. Sethi's finding that Lathan has severe restrictions as a result of her recurrent chemotherapy treatment was not based upon Dr. Sethi's own physical examination, which contained primarily normal findings, but instead based on Lathan's subjective reports. Tr. 25, 496-497. The ALJ also explained that Dr. Sethi's opinion conflicts with longitudinal treatment records and reports in the record that Lathan had been doing well. Tr. 25. Specifically, the ALJ referenced treatment notes from Lathan's

15

treating oncologist, Dr. Ritter, that Lathan reported she was doing well, and Dr. Ritter's opinion that Lathan's lymphoma was not interfering with her ability to work.[3] Tr. 24-25.

Lathan points out that state reviewing physician Elliott Goytia opined that Lathan can perform work at the sedentary level. Doc. 14, p. 10. The ALJ considered Dr. Goytia's opinion. Tr. 26. She accurately described how, after more records were received, a different state agency reviewer concluded that Lathan's impairments were not severe, and that she gave great weight to the later reviewer's opinion. Tr. 26.

Lathan argues that the ALJ found her credible and, therefore, committed error when she did not find Lathan's impairments severe after Lathan testified that she has fatigue, can only walk ¾ of a block because of pain, and that, after walking ¾ of a block, her legs ache and her ankles swell. Doc. 14, p. 12. The ALJ noted that she found Lathan's hearing presentation "generally credible" (Tr. 24); however, she specifically stated that she found Lathan's statements concerning the intensity, persistence and limiting effects of her symptoms not entirely credible (Tr. 23).

Lathan appears to assert that Dr. Ritter's observation that "diarrhea is not something we normally see as a result of chemotherapy" is incorrect and cites to websites purportedly indicating that diarrhea can be a side effect of chemotherapy. Doc. 14, p. 13. The Court does not try the case *de novo* or resolve conflicts in evidence. See *Garner*, 745 F.2d at 387. Moreover, the ALJ explained that Lathan had reported good improvement in her diarrhea after consulting the gastroenterologist, indicating that the condition is not one that lasts longer than 12 months or is as severe as alleged. Tr. 26; *see also* Tr. 25 (ALJ's commenting that Lathan's reports of diarrhea in the record are not as severe as she alleged at the hearing and that there is

---

[3] Lathan argues that the ALJ did not appreciate that Dr. Ritter's opinion that Lathan is not disabled was based only on her Lymphoma and not based on a consideration of her other problems. Doc. 14, p. 13. However, the ALJ explicitly stated that Dr. Ritter's opinion only considered the disabling effect of her lymphoma. Tr. 25.

16

"very little mention of the diarrhea in the record except in early 2011"). With respect to Lathan's headaches, the ALJ noted that Lathan had suffered from headaches for years and yet they did not preclude her from working. Tr. 23. She observed that Lathan's headaches are controlled by medication. Tr. 24. Regarding Lathan's leg swelling, the ALJ explained that in September 2008 she complained of leg swelling but that Doppler testing showed no deep vein thrombosis and Lathan continued working until May 2009. Tr. 24. Physical exams were largely normal and Lathan primarily visited her doctor for medication refills. Tr. 24 (citing Dr. Okoro's records).

In sum, although framed as an attack on the ALJ's treatment of the opinion evidence, Lathan is essentially urging the Court to reweigh the evidence, which the Court cannot do. *See Garner*, 745 F.2d at 387. As described above, the ALJ's decision is supported by substantial evidence and, therefore, must be affirmed. *See Higgs*, 880 F.2d at 862-863 (lack of objective medical evidence showing that claimant is significantly affected by impairment properly decided at Step Two); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (The Commissioner's decision cannot be overturned so long as substantial evidence supports the ALJ's conclusion).

### B. Lathan waived any purported argument regarding her alleged cardiac issues

In her opening brief, in the statement of facts section, Lathan asserts that, at the time of the hearing, she was "still having occasional symptoms" regarding her "cardiac issues," but that her "cardiac work up had not yet been completed." Doc. 14, p. 7. Later, in her section arguing that the ALJ's step two finding is erroneous because her doctors found that she does have a severe impairment, Lathan states,

> In this case, the ALJ found some specific impairments including the lymphoma in remission, obesity, migraines, and hypertension. Tr. 21. The ALJ did not consider any cardiac impairment including mild concentric left ventricular hypertrophy and mild to moderate tricuspid regurgitation. (The ALJ did appear to state at the hearing that the

17

> cardiac problems disabled her as of December 2012 Tr. 50) The Judge did not consider any mental impairments including Ms. Lathan's depression and anxiety. The ALJ specifically found Ms. Lathan's hearing presentation "generally credible". Tr. 24; 50. Ms. Lathan testified that she can stand for 15 minutes at a time, Tr. 44, because of her leg pain and aching; that is more than a slight or minimal limitation. Being off balance because of medication side effects, Tr. 38, is more than a slight or minimal limitation. The consultative examination of Dr. Sethi found significant restrictions from basic work related activates such as sitting, standing, walking, lifting, carrying and handling, Tr. 497. This is consistent with her complaints noted by Dr. Okoro and is certainly more than a slight or minimal limitation.
>      The ALJ erred in denying the claim at Step Two, and therefore a reversal or remand is necessary.

Doc. 14, p. 9.

Aside from the above-cited passage, Lathan does not discuss her cardiac condition in her brief or assert that the ALJ committed an error with respect to her cardiac condition.[4] Defendant, in her brief, contends that Lathan did not present an argument with respect to her cardiac condition and that, therefore, such an argument is waived. Doc. 16, p. 5 (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.")) In her reply brief, Lathan asserts that the ALJ's "failure to keep the record open and develop this cardiac evidence is error and a remand is required." Doc. 17, p. 2. The Court finds that any purported argument Lathan may have intended to make with respect to the ALJ's findings regarding her alleged cardiac condition have been waived because she failed to make any effort to develop such an argument. *See McPherson*, 125 F.3d at 995-996. Her belated argument that the ALJ failed to develop the record regarding her alleged cardiac condition is also waived, as it was asserted for the first time in her reply brief. *See Scottsdale*

---

[4] Lathan does not identify evidence in the record wherein a doctor found that she had a severe cardiac impairment.

18

*Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (issues raised for the first time in a reply brief are deemed waived and need not be considered by the court).[5]

### VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED.**

Dated: August 4, 2015

Kathleen B. Burke
United States Magistrate Judge

---

[5] Lathan states in similar conclusory fashion, "The Judge did not consider any mental impairments including Ms. Lathan's depression and anxiety."  Doc. 14, p. 9.  Lathan did not seek treatment for anxiety or depression and makes no argument that these alleged conditions were severe.